IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANNAMALAI ANNAMALAI,

                Plaintiff,

v.

B. MALCOLM, RANDALL PASS, LINDA LINDNER,
JAMES BELL, K. BLOCK, JOHN DOE NURSES 1–4,      OPINION and ORDER
RYAN WILLIS, ERIC EMMERICH, FEDERAL
BUREAU OF PRISONS, UNITED STATES OF             25-cv-364-jdp
AMERICA, OFFICER KESHTRUP, PSYCHOLOGIST
NORGE, AMBER LABELLE, JOHN DOE SHU
CORRECTIONAL OFFICERS 1–10, and FOOD
SERVICES SUPERVISOR FISCHER,

                Defendants.

---

Plaintiff Annamalai Annamalai has an extensive history of abusive litigation in federal and state courts. Several motions and matters are before this court, including the initial screening of Annamalai's proposed amended complaint. Dkt. 35. Proceeding without counsel, Annamalai alleges that defendants denied him a proper religious diet and committed several other wrongs under federal and Wisconsin law. Annamalai is a "three striker" under 28 U.S.C. § 1915(g) and didn't prepay the filing fee. So he must plausibly allege imminent danger of serious physical injury to proceed.

Because Annamalai is incarcerated at FCI-Oxford, I must screen the amended complaint under 28 U.S.C. § 1915A and dismiss any part of it that is frivolous or malicious, fails to state a claim for which I could grant relief, or seeks money damages from an immune defendant. I must accept Annamalai's allegations as true and construe them generously, holding the amended complaint to a less stringent standard than one a lawyer drafts. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

I will dismiss the amended complaint because Annamalai hasn't alleged a plausible claim for relief or that he's in imminent danger of serious physical injury. But I will give Annamalai a final opportunity to submit a second amended complaint that fixes the problems with his claim under the Religious Freedom Restoration Act (RFRA). I will also deny without prejudice Annamalai's motion for injunctive relief and rule on the other pending motions.

ALLEGATIONS OF FACT

Annamalai's Hindu faith prohibits him from consuming food that is cooked, prepared, or stored with beef. When beef is cooked or served, Annamalai has to choose the "self-select" menu or "no-flesh" items. Dkt. 35 at 3. But the prisoners who work as cooks use the same kitchen, pots and pans, utensils, oils, and other ingredients to prepare both beef and no-flesh items. Jewish and Muslim prisoners receive kosher and Halal meals.

Because Annamalai hasn't received his religious diet, he has experienced "forced starvation [that] appears to have [led] to numerous" physical and mental health consequences, including chronic diabetes, "cholesterol," hypertension, blurry vision, "prostate," respiratory issues, arthritis, malnutrition, knee pain, joint pain, back pain, post-traumatic stress syndrome (PTSD), depression, panic attacks, anxiety, insomnia, and repeated suicide attempts. *Id.*

Annamalai repeatedly complained that he wasn't receiving his religious diet to defendants Willis, Fisher, Emmerich, the Bureau of Prisons, and the United States. Annamalai also made complaints about a "medical compliance diet based on [his] underlying chronic medical conditions" to defendants Malcolm, Pass, Block, Bell, Linder, Emmerich, and John Doe Nurses 1–4. *Id.* After Annamalai made these complaints, the above defendants retaliated against him, which included issuing "retaliatory incident reports." *Id.*

2

After filing grievances, Annamalai was housed with a female prisoner, "Ms. Sanchez Velasquez." *Id.* at 4. Hinduism prohibits a male from cohabitating with an unmarried woman, unless the woman is the man's relative. Annamalai complained to defendants Emmerich, LaBelle, and Norge. In response, Annamalai started to receive "bogus incident reports" from other individuals based on possession of stolen items and other false accusations.

Sanchez Velasquez regularly performed fellatio and erotic massages on other prisoners while Annamalai was in the cell. Annamalai had to "pass on the messages" of Sanchez Velasquez's clients "for the next sex act." *Id.* Some of Sanchez Velasquez's clients demanded sex from Annamalai. After complaining about Sanchez Velasquez for several months, Annamalai was transferred to Wood unit.

Defendants Malcolm, Black, and Bell conspired to house Annamalai with Scott Halverson, a "mentally retarded" child molester, when Annamalai arrived at Wood unit. *Id.* at 4. (The BOP's prisoner locator shows that Halverson died on December 5, 2024.)

Annamalai's cohabitation with Halverson was unpleasant. Malcolm hired Annamalai to be a "companion job" for Halverson. *Id.* Annamalai was told that his job was to direct Halverson to pill call, the shower, and the chow hall daily. Halverson had bowel problems, so Annamalai had to clean Halverson's feces with his bare hands. Annamalai was also exposed to Halverson's urine.

Annamalai was exposed to sexual improprieties while housed with Halverson, who would frequently masturbate in their cell. Halverson ejaculated on Annamalai's face several times. One night, Halverson inserted his penis into Annamalai's anus, which caused rectal bleeding.

3

Annamalai told Malcolm about the rape and other "sexual tortures." *Id.* at 5. Malcolm responded that the abuse was a part of his job. Annamalai also reported the abuse to defendants Emmerich, LaBelle, Block, Bell, and Pass, but they ignored him.

Annamalai filed grievances based on the events in Wood unit. Then, on March 24, 2025, Malcolm delivered Annamalai to nondefendant Captain Moore for a new job assignment "in the compound." *Id.* That job required Annamalai clean bird droppings, dust, and debris even though he had lost the ability to breathe through his nose in October 2024. At some point, Annamalai asked Malcolm, Randall, Pass, Block, Bell, Lindner, and Emmerich for medical help for that condition but they ignored him. Consequently, Annamalai lost taste in his tongue, and he was unable to sleep at night because he couldn't breathe through his mouth.

On March 24, 2025, in the evening, Annamalai fell seriously ill with vomiting and a bloody nose. Annamalai asked for medical help the next morning and was taken to health services, but he received no treatment. Later that day, Annamalai was taken to segregation based on an incident report that he failed to report for work. Two days later, Annamalai was put on suicide watch.

Upon Annamalai's return to segregation, he experienced sexual abuse. On April 1, 2025, Annamalai was housed with prisoner Jason Daniel Gandy, whom Annamalai characterizes as a sexual predator. (The BOP's prisoner locator shows that Gandy is no longer housed at FCI-Oxford.) Annamalai complained about being housed with Gandy to officers in the special housing unit (SHU), defendants John Doe SHU Correctional Officers 1–10. One of the officers told Annamalai that if he "fucked with them" they would "fuck him up" and to enjoy his new home with his new husband. *Id.* at 6.

4

Annamalai was physically and sexually assaulted by Gandy. Annamalai repeatedly complained to the Doe SHU officers, Emmerich, LaBelle, Norge, Malcolm, Block, and defendant Keshtrup, but they did not help him.

Annamalai was continuously bleeding from his nose. He asked the Doe SHU officers, Emmerich, LaBelle, Norge, Malcolm, Block, Keshtrup, and Lindner for help, but they ignored him.

On April 17, 2025, Annamalai was rushed to UW Health Hospital for a nose surgery and returned to FCI-Oxford even though he was under anesthesia and dripping blood. Three days later, Keshtrup ordered Annamalai to work by removing over 400 pounds of legal papers, which caused Annamalai to fall seven times and injure his legs, hands, elbows, back, and buttocks. Annamalai lay on the floor for more than 25 minutes without staff assistance. Annamalai refused to work, and in response he was segregated for 19 days starting on May 2, 2025.

Annamalai is assigned to work as a "compound orderly" even though he has a medical restriction for no outdoor work. This job was a "punitive punishment" that eliminated Annamalai's access to the law library, which caused the dismissal of a criminal appeal.

ANALYSIS

A.  **Preliminary matters**

Annamalai filed an amended complaint and motion for injunctive relief, and then filed another pleading and injunctive relief motion. Dkt. 31; Dkt. 32; Dkt. 35; Dkt. 36. Each pair is similar in substance. I will evaluate the second pair because those submissions appear to be the most complete. The first pair, Dkt. 31 and Dkt. 32, is denied as moot.

5

Annamalai moves the court to withdraw his earlier motion asking the court to accept his amended complaint if it received that pleading late. Dkt. 41. I will grant in part this motion to deny the earlier motion as moot. *See* Dkt. 34. I initially dismissed the case for failure to prosecute and failure to comply with a court order, but I later vacated that order and reopened the case. That order mooted Annamalai's request to accept his amended complaint as timely.

**B. Imminent danger exception**

To avoid § 1915(g), a prisoner must plausibly allege imminent, serious physical harm. *Sanders v. Melvin*, 873 F.3d 957, 960–61 (7th Cir. 2017). The prisoner must allege a physical injury that is imminent or occurring at the time the complaint is filed and show that the threat or prison condition causing the physical injury is "real and proximate." *Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003). Past dangers that a prisoner no longer faces when he files the complaint don't meet this requirement. *Heimermann v. Litscher*, 337 F.3d 781, 782 (7th Cir. 2003). Even if a prisoner brings claims plausibly suggesting that he's in imminent danger of serious physical injury, the prisoner cannot proceed on unrelated claims that don't involve that danger. *See Jacobs v. Sec'y of Dep't of Corr.*, No. 24-cv-785-jdp, 2025 WL 89268, at *1 (W.D. Wis. Jan. 14, 2025); *Hayes v. Swiney*, No. 18-cv-1387, 2018 WL 3819103, at *3 (S.D. Ill. Aug. 10, 2018).

Many of the allegations on which Annamalai bases his claims at most involve past dangers that he no longer faced when he filed the complaint. I will not evaluate Annamalai's claims based on allegations involving:

- Retaliatory and bogus incident reports received after he complained about his religious dietary concerns;

- Lack of safety based on being housed with Sanchez Velasquez, Halverson, and Gandy; and

- Inadequate law library access.

Annamalai's only allegations that *potentially* suggest imminent danger involve:

- Prison officials' failure to provide Annamalai with a proper religious diet and his resulting health problems;

- Having to perform outdoor work even though he has a medical restriction against that work and suffers from nose bleeding.

I will screen claims based on these two general allegations only.

**C. Screening the amended complaint**

There is a preliminary problem: improper joinder. Under Federal Rule of Civil Procedure 20(a)(2), a plaintiff may join multiple defendants only when the claims arise from the same set of events and share a common question of law or fact. Courts may consider whether the plaintiff has improperly joined defendants when screening a complaint. *See Mitchell v. Kallas*, 895 F.3d 492, 502–03 (7th Cir. 2018).

Annamalai's allegations about an improper religious diet arise from different events than his allegations about outdoor work and nose bleeding. I have discretion to sever the allegations about outdoor work and nose bleeding into a separate lawsuit, but I will not do that because those allegations fail to state a plausible claim or to show imminent danger.

**1. Outdoor work and nose bleeding**

I take Annamalai to bring an Eighth Amendment claim based on conscious disregard of health and safety related to outdoor work and nose bleeding. I will assume for purposes of this

7

screening order that Annamalai may bring this claim for injunctive relief and damages under, respectively, 28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 288 (1971).

A prison official is liable under the Eighth Amendment if the official consciously disregards an excessive risk to prisoner health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard means that the official knew of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he actually drew that inference. *Id.*

I take Annamalai to allege that Malcolm required him to work outdoors even though he had a medical restriction against that work. But Annamalai doesn't describe the restriction or allege that Malcolm was aware of it. These allegations don't suggest conscious disregard.

Annamalai alleges that he asked Malcolm, Randall, Pass, Block, Bell, Lindner, and Emmerich for medical help but that they ignored him. But Annamalai doesn't allege any facts about the content of these requests or provide the approximate dates on which he made them. Nor has Annamalai alleged the factual basis for his belief that he lost taste in his tongue because these defendants failed to respond to those requests. These allegations don't plausibly suggest conscious disregard.

Annamalai alleges that he didn't receive medical help on March 24, 2025, when he fell seriously ill with vomiting and a bloody nose. But Annamalai hasn't alleged which defendants, if any, ignored his request for medical help. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (stating that defendant is liable for only "his or her own misconduct" under *Bivens*).

Annamalai alleges that he continuously bled from his nose, and that Doe SHU officers, Emmerich, LaBelle, Norge, Malcolm, Block, Keshtrup, and Lindner ignored his requests for help. But Annamalai was later taken to the hospital for nose surgery. His nose was dripping

8

blood when he returned to FCI-Oxford, but Annamalai doesn't allege that any defendant ignored any further request for treatment after he returned. These allegations don't plausibly suggest that any defendant was ignoring any nose bleeding by Annamalai when he filed the complaint. Even if these allegations suggest past conscious disregard, § 1915(g) bars them.

Annamalai also brings a claim under the Federal Tort Claims Act, along with state-law claims based on medical negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. But, for similar reasons, I can discern no plausible basis for liability under any of these causes of action. The federal conscious disregard standard is more demanding than the standards for most state-law claims, but Annamalai's allegations don't plausibly suggest that any defendant violated any applicable standard of care. *See Sawyer v. Midelfort*, 227 Wis. 2d 124, 149 (1999); *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 375 (Ct. App. 1994); *Kaminski by Kaminski v. BlueGreen Vacations Unlimited, Inc.*, No. 24-cv-270-jdp, 2025 WL 2161140, at *6 (W.D. Wis. July 30, 2025). Nor do Annamalai's allegations plausibly suggest that any defendant intentionally engaged in any extreme and outrageous conduct that caused him emotional distress. *See Rabideau v. City of Racine*, 2001 WI 57, ¶ 33. Without a plausible underlying tort claim, the FTCA claim is not viable. *Nance v. United States*, No. 22-cv-3861, 2024 WL 480737, at *2 (N.D. Ill. Jan. 9, 2024), *aff'd*, No. 24-1181, 2024 WL 4502107 (7th Cir. Oct. 16, 2024).

I will not allow Annamalai to proceed on any claim based on his allegations about outdoor work and nose bleeding.

D.  **Religious diet and resulting harm**

Annamalai brings claims under the Establishment Clause, Equal Protection Clause, and the Religious Freedom Restoration Act of 1993 (RFRA). Again, I will assume for this screening

9

order that Annamalai can bring the constitutional claims under § 1331 and *Bivens*. I begin with the Establishment Clause claim.

The Establishment Clause "prohibits Congress from enacting any law 'respecting an establishment of religion.'" *Freedom From Religion Found., Inc. v. Concord Cmty. Sch.*, 885 F.3d 1038, 1045 (7th Cir. 2018) (quoting U.S. Const. amend. I, cl. 1). The basic policy behind the Establishment Clause "is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Woodring v. Jackson Cnty., Ind.*, 986 F.3d 979, 987 (7th Cir. 2021). Coercion, such as making religious observance compulsory, "was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022). In an appropriate case, "impermissible endorsement of a religious view" or "a forbidden religious purpose" may also violate the Establishment clause. *See Mayle v. United States*, 891 F.3d 680, 684 (7th Cir. 2018).

I take Annamalai to base this claim on the allegation that Jewish and Muslim prisoners received kosher and Halal diets even though his diet failed to comply with the tenets of Hinduism. But Annamalai acknowledges that he could choose from the self-select menu or no-flesh items when beef was cooked or served. Some effort was made to accommodate Annamalai's dietary preferences. Annamalai alleges that the cooks failed to prepare the self-select and no-flesh items separately from beef, but he hasn't alleged that any defendant instructed the cooks to prepare the food that way even though the defendant realized that those methods would violate the tenets of Hinduism. The bare allegation that Jewish and Muslim prisoners received their religious diets doesn't plausibly suggest that Annamalai's

10

failure to receive a proper religious diet amounted to a religious establishment. I will not allow Annamalai to proceed under the Establishment Clause.

Annamalai fails to state an equal protection claim for similar reasons. He hasn't alleged facts to support a plausible inference that any defendant intentionally treated Muslims and Jewish prisoners differently than Hindu prisoners "for no reason at all." *See Reed v. Faulkner*, 842 F.2d 960, 964 (7th Cir. 1988).

I turn to the RFRA claim, which is Annamalai's primary claim. RFRA prohibits the federal government "from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means." *Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020). The basic rule is that a "prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition." *See Thompson v. Holm*, 809 F.3d 376, 381 (7th Cir. 2016).

Annamalai alleges that because he hasn't received his religious diet, he has experienced "forced starvation" that "appears" to have caused several physical and mental health problems. I take Annamalai to allege that he is refusing food entirely. *See* Dkt. 35 at 3 ("I am on hunger and forced starvation all day, all week, all months, and all year!!"). This allegation is implausible. It's clear from the amended complaint's structure that Annamalai started complaining about an improper religious diet before 2025. Unless Annamalai is being force-fed (which he hasn't alleged), Annamalai cannot be refusing food entirely. Annamalai may be refusing some food, but he hasn't alleged how often he eats, what foods he eats, and what foods he refuses. Nor has Annamalai alleged any facts plausibly suggesting that his numerous health problems were caused by his apparent refusal to eat at times. Annamalai seems to acknowledge the tenuous causal link, alleging that his forced starvation "appears" to have caused those

11

conditions. Furthermore, most of those conditions are chronic and, without more factual support, don't suggest imminent danger. Annamalai hasn't alleged enough facts about how those conditions are harming his health to allow the me to plausibly infer that his dietary disruptions have denied him adequate nutrition and harmed his health. I will not allow Annamalai to proceed on a RFRA claim. (Annamalai's allegations about an improper religious diet don't suggest a violation of any other cause of action that he piggybacks on his RFRA claim.)

E. Leave to amend

When a plaintiff proceeds without counsel, the court of appeals has cautioned against dismissing his case without giving him a chance to amend the complaint. *Felton v. City of Chicago*, 827 F.3d 632, 636 (7th Cir. 2016). But "if it is clear that any amendment would be futile," I need not grant leave to amend. *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).

Annamalai is a veteran (and often vexatious) litigator, and the court gave him instructions on how to amend the complaint. Despite his experience and the court's instruction, Annamalai hasn't stated any facially plausible claim. Annamalai's long history as an abusive litigant also weighs against giving him another opportunity to amend his pleading.

However, I will give Annamalai a final opportunity to file a second amended complaint that fixes the problems with his RFRA claim. Annamalai may attempt to allege only a RFRA claim complaint based on his allegations of an improper religious diet and resulting health problems. The court will not consider any other claims. (Any allegations dismissed exclusively pursuant to § 1915(g) may be brought in a *new* lawsuit, provided that Annamalai pay the full filing fee at the time he files that suit.)

Annamalai must file the second amended complaint on the court's prisoner complaint form, which the court will send him along with this order. If Annamalai needs more space to allege his claims, he may submit no more than three (3) supplemental pages. I have imposed the three-page limit to curb Annamalai's abusive litigation and because he need only allege a plausible RFRA claim in the second amended complaint. Any handwritten or typewritten text on the form or any supplemental sheet must be large enough and have enough spacing between the lines and in the margins for the court to read it easily. Specifically, the second amended complaint, including any supplemental page, must have at least 1" margins on all sides, and there must be at least 1.5 spacing between lines of text. Plaintiff must not retype or otherwise edit the court's form; he should answer each question on the form and stay within the space provided. Any additional information Annamalai wishes to provide should be included in a supplemental page, subject to the requirements set forth in this order. The second amended complaint must not contain footnotes.

In drafting the second amended complaint, Annamalai should be mindful that, to state a claim, a pleading need only contain "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Annamalai's allegations must be "simple, concise, and direct." Fed. R. Civ. P. 8(d). Annamalai should state his allegations in numbered paragraphs, "each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Annamalai may identify his RFRA claim but he should omit any legal arguments. Annamalai should also provide dates, or reasonable date ranges, for the allegations on which he bases his RFRA claim.

Annamalai should carefully consider whether he is naming proper defendants, which means that he should omit defendants who did not personally participate in or cause a violation

13

of RFRA. Annamalai must explain what each defendant did, or failed to do, to violate RFRA. Annamalai should avoid referring to defendants collectively. Annamalai also should identify by full name in the second amended complaint's caption every one of the defendants. Annamalai may refer to a defendant by "John Doe" or "Jane Doe" if he does not know the defendant's full name. If Annamalai refers to a defendant as a Doe defendant, he should describe that individual as specifically as possible in the second amended complaint's caption.

### F. Motion for injunctive relief

I begin with a preliminary matter. Annamalai moves the court to consider "further retaliatory acts" to support his request for injunctive relief, and to take judicial notice of a recent Supreme Court case. Dkt. 37. Similarly, Annamalai has filed an emergency motion about dangerous prison conditions, and a related notice in which he alleges more retaliatory acts. Dkt. 42 and Dkt. 43. These submissions are improper attempts to circumvent the page limits that the court imposed on Annamalai's motion for injunctive relief, and the Supreme Court case that he refers to is not relevant to any issue before the court. But, for efficiency, I will grant Annamalai's requests to consider these documents and the Supreme Court case.

Annamalai seeks both a temporary restraining order and preliminary injunction. "[T]he standard for determining whether either form of relief is appropriate is the same." *Democratic Nat'l Comm. v. Bostelmann*, 447 F. Supp. 3d 757, 765 (W.D. Wis. 2020). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

I cannot grant injunctive relief for claims on which I have not allowed a party to proceed. *See Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (party must make a strong showing that he is likely to succeed on the merits to obtain preliminary injunctive relief); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (party must show a relationship between the injunctive relief sought and his claims). Annamalai hasn't stated any facially plausible claim, so I will deny his injunctive relief motion.

To curb Annamalai's abusive litigation, I will not allow him to accompany his second amended complaint with a motion for injunctive relief. But Annamalai may request emergency or preliminary injunctive relief in second amended complaint itself. If Annamalai states a facially plausible RFRA claim in that pleading, I will order the government to respond to the request for emergency or preliminary injunctive relief.

ORDER

IT IS ORDERED that:

1. Plaintiff Annamalai Annamalai's amended complaint, Dkt. 35, is DISMISSED pursuant to 28 U.S.C. § 1915(g) and for failure to state a claim.

2. Plaintiff may have until September 11, 2025, to submit a second amended complaint that fixes the problems with his RFRA claim.

3. The second amended complaint will act as a complete substitute for all earlier pleadings and related documents. This case will proceed on only the allegations made and RFRA claim presented in the second amended complaint, and against only the defendants specifically named in the second amended complaint's caption.

4. If plaintiff fails to comply with this order, I may dismiss the case.

5. Plaintiff's first proposed amended complaint and first motion for injunctive relief, Dkt. 31 and Dkt. 32, are DENIED as moot.

6. Plaintiff's motion for leave to file amended complaint, Dkt. 34, is DENIED as moot.

7. Plaintiff's motion for injunctive relief, Dkt. 36, is DENIED without prejudice.

15

8. Plaintiff's notice of further retaliatory acts and emergency notice, Dkt. 37 and Dkt. 41, are GRANTED as provided in this order.

9. Plaintiff's notice about withdrawal of motion for reconsideration, Dkt. 41, is GRANTED in part as provided in this order.

10. Plaintiff must inform the court of any new address. If he fails to do this and defendants or the court cannot locate him, this case may be dismissed.

11. Plaintiff should keep a copy of all documents for his own files. If he is unable to use a photocopy machine, he may send out identical handwritten or typed copies of his documents.

12. The clerk of court is directed to send plaintiff a copy of the court's prisoner complaint form.

Entered August 12, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge